# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2017          Decided August 29, 2017

No. 16-7107

GARY E. JOHNSON, ET AL.,
APPELLANTS

v.

COMMISSION ON PRESIDENTIAL DEBATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01580)

*Bruce E. Fein* argued the cause for appellants. With him on the briefs were *W. Bruce DelValle*.

*Lewis K. Loss* argued the cause for appellees. With him on the brief were *Uzoma N. Nkwonta*, *Robert F. Bauer*, *Marc E. Elias*, *Elisabeth C. Frost*, *Charles H. Bell Jr.*, *John R. Phillippe*, *Jr.*, and *William D. Coglianese*. *Michael S. Steinberg* entered an appearance.

Before: BROWN and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion concurring in Part I and concurring in the judgment filed by *Circuit Judge* PILLARD.

BROWN, *Circuit Judge*: Every four years, we suffer through the celebration of democracy (and national nightmare) that is a presidential election. And, in the end, one person is selected to occupy our nation's highest office. But in every hard-fought presidential election there are losers. And, with quadrennial regularity, those losers turn to the courts. *See, e.g.*, *Perot v. FEC*, 97 F.3d 553 (D.C. Cir. 1996); *Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991); *Johnson v. FCC*, 829 F.2d 157 (D.C. Cir. 1987). Today's challenge concerns 2012 third-party candidates Gary Johnson and Jill Stein. Their Complaint presents novel claims under antitrust law and familiar First Amendment allegations. The district court dismissed the Complaint, finding Plaintiffs lacked Article III standing, antitrust standing, and in the alternative, failed to state a claim for which relief could be granted. *See Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159 (D.D.C. 2016). For the reasons set forth below, we affirm.

I.

Gary Johnson and James Gray ran as the Libertarian Party's presidential and vice presidential candidates in the 2012 elections, while Jill Stein and her running mate Cheri Honkala ran on the Green Party ticket. Both slates qualified on a sufficient number of state ballots to have a mathematical chance of an Electoral College victory. Each was nonetheless excluded from the nationally televised general-election debates.

They claim that they were excluded pursuant to an agreement between the Obama for America and Romney for President campaigns. They allege the parties' agreement, reflected in a memorandum of understanding ("MOU"),

stipulated to three presidential debates and one vice presidential debate, and designated dates, locations, moderators, and topics. Those would be the only four debates between the major-party candidates, "except as agreed to by the parties" to the MOU. JA 63. The MOU provided that the Commission on Presidential Debates ("Commission"), a nonprofit organization, would host the debates subject to its willingness to "employ the provisions" of the MOU. JA 64.

Any candidate, other than the signatories, would be invited to participate in the debates only if he or she satisfied certain selection criteria set forth in the MOU. First, the candidate had to be constitutionally eligible to be president. Second, he or she must have qualified to appear on "enough state ballots to have at least a mathematical chance of securing an Electoral College majority in the 2012 general election." Compl. ¶ 74, JA 45–46. And, third, the candidate had to have achieved a "level of support of at least 15% (fifteen percent) of the national electorate as determined by" averaging the most recent results of "five selected national public opinion polling organizations." Id. ¶ 74, JA 46. Johnson and Stein met the first two criteria, but they fell short of the 15 per cent polled-support threshold.

The third-party candidates, their running mates, their campaigns, and the parties they represented in the 2012 election (collectively, "Plaintiffs" for purposes of this opinion) brought suit, challenging the MOU as an unlawful agreement to monopolize and restrain competition in violation of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1–2. The Complaint alleges a conspiracy with the overall objective to:

> entrench[] market power in the presidential debates market, the presidential campaign market, and the electoral politics market of the two major political

parties by exercising duopoly control over presidential and vice presidential debates in general election campaigns for the presidency.

Compl. ¶ 1, JA 15. The Complaint also alleges exclusion of Plaintiffs from the debates "because of hostility towards their political viewpoints" in violation of their First Amendment rights to free speech and association. *Id*. On appeal, Plaintiffs have abandoned their further claim of intentional interference with prospective economic advantage and relations.

Plaintiffs allege they were injured "in their businesses of debating in presidential elections, participating in presidential election campaigns, and engaging in electoral politics." *Id.* ¶ 90, JA 49. They claim to have lost millions of dollars' worth of publicity, campaign contributions, and matching funds that ordinarily would follow participation in the debates, as well as the salaries they would have earned as President and Vice President if they had won. *Id.* ¶ 90, JA 49–50. They sought invalidation of the 15 per cent polled-support requirement, injunctive relief dissolving the Commission and enjoining further collusion between the two major parties, and treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15. They named as defendants the Commission and one of its founders, Frank J. Fahrenkopf, Jr.; Michael D. McCurry, a Commission co-chair; the Republican and Democratic National Committees; and 2012 presidential candidates Barack Obama and Willard Mitt Romney. Compl. ¶ 24–30, JA 23–26. Defendants' interests on appeal are represented primarily by counsel for the Commission.

The district court dismissed the case under Federal Rules of Civil Procedure 12(b)(1) and (6). It held that Plaintiffs lacked Article III standing to litigate their Sherman Act claims because they were based on "wholly speculative" injuries

5

"dependent entirely on media coverage decisions" by nonparties. *Johnson*, 202 F. Supp. 3d at 169. The court also found the alleged harm—lack of media coverage that led to low popularity—preceded their exclusion from the debates. *See id.* Plaintiffs had thus failed to allege injury in fact that was either traceable to the Commission or redressable in this case. We review the district court's dismissal *de novo*, taking the facts alleged in the Complaint as true and drawing all reasonable inferences in Johnson and Stein's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001).

## II.

We begin with Plaintiffs' antitrust claims, asking first whether Plaintiffs may properly proceed before this Court on these allegations. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Accordingly, the Court must assess Plaintiffs' standing based on "the specific common-law, statutory or constitutional claims that [they] present[]." *Int'l Primate Prot. League v. Administrator of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991).

The "irreducible constitutional minimum of [Article III] standing" requires that a plaintiff demonstrate three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. But here we also discuss a second type of "standing" doctrine: antitrust (*i.e.* statutory) standing. While Article III standing is a familiar concept common to all cases, antitrust standing is claim-specific. It asks "whether the

plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractor of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (citing Daniel Berger & Roger Bernstein, *An Analytical Framework for Antitrust Standing*, 86 YALE L.J. 809, 813 n.11 (1977); Earl E. Pollock, *Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine*, 32 ANTITRUST L.J. 5, 6–7 (1966)). We will discuss each in turn.

A.

Plaintiffs' injuries are clearly pleaded in the Complaint; they allege their exclusion from the debates caused them to lose access to television audiences and resulting campaign contributions worth hundreds of millions of dollars. This injury—though shared with many individuals who may have wished to campaign for the presidency but did not join Mitt Romney and Barack Obama on the debate stage—is nonetheless particularized. *See FEC v. Akins*, 524 U.S. 11, 23–25 (1998); *see also Akins v. FEC*, 101 F.3d 731, 736 (D.C. Cir. 1996) (en banc).[1] Each excluded individual was uniquely

---

[1] Plaintiffs have adopted a litigation strategy attributing their exclusion to the fifteen percent requirement—presumably reducing the number of similarly-situated persons to those who had obtained a mathematical possibility of victory in the electoral college. *But see* Philip Bump, *So You Want an Independent Candidate for President? You're Running Out of Time.*, WASH. POST (May 5, 2016), https://tinyurl.com/Bump-Article ("To collect [the requisite] signatures [to achieve a mathematical possibility of winning the electoral college], you need one of two things: a lot of organization or a lot of money. . . . [The cost] varies by state, but if we look at the upper end of that [price] range, we're talking about a $5.5 million investment to get on the ballot in all 50 states."). Of course, counsel's particular litigation strategy—the way they choose to characterize the *effect* of the alleged injury—hardly controls our analysis on this point.

rejected from the debates, and security would no doubt have stopped them each individually had they attempted to take the stage.

Things become far more complicated, however, when we consider whether "a favorable decision" of this Court may "redress[]" Plaintiffs' injury. *Lujan*, 504 U.S. at 561. Plaintiffs' requested relief—whether stated in the form of a request for injunctive relief or damages—amounts to a request for a declaratory judgment stating the Commission is not entitled to exclude particular individuals from its debates. On this point, we must agree with this Court's opinion in *Perot v. Federal Election Commission*: "[I]f this [C]ourt were to enjoin the [Commission] from staging the debates or from choosing debate participants, there would be a substantial argument that the [C]ourt would itself violate the [Commission's] First Amendment rights." 97 F.3d at 559.

Acknowledging this shortcoming hardly determines the merits of Plaintiffs' claims, Concurring Op. 3; it assumes them and reflects on the permissibility of the resulting remedy. The district court's opinion put all parties on notice of the redressability problem. *See Johnson*, 202 F. Supp. 3d at 172–73 (citing *Perot*, 97 F.3d at 559; *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199–200 (6th Cir. 1996)). Yet Plaintiffs failed to address the point. In so doing, they leave us with, at least, grave doubt as to the constitutionality of any order issued by this Court aimed to redress Plaintiffs' injury.

## B.

### i.

In such circumstances, and where a statutory jurisdiction could determine the result, the doctrine of constitutional avoidance permits us to resolve this case on alternative

grounds, namely antitrust standing. *See* 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.15, p.338 (3d ed. 2014) ("If both constitutional and prudential objections are raised to standing . . . it is entirely appropriate to deny standing on prudential grounds if that course is easier, or more clearly right, than to rule on constitutional grounds first."); *see also Kowalski v. Tesmer*, 543 U.S. 125, 129 & n.2 (2004) (assuming plaintiffs satisfied Article III standing and deciding the case on prudential third-party standing grounds).

This Court has acknowledged its "jurisdiction does not turn on antitrust standing." *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107–08 (D.C. Cir. 2002) (citing *Associated Gen. Contractors of California, Inc.*, 459 U.S. at 535 n.31 ("[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine.")). The concurrence, therefore, suggests we cannot "sidestep" the Article III standing inquiry to resolve this case on antitrust standing grounds. Concurring Op. 1. But proceeding directly to clearly-dispositive, non-jurisdictional, prudential standing analysis is a permissible—even preferable—course in rare cases where jurisdictional, Article III standing inquiry yields grave constitutional doubt. *See, e.g.*, *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 921 n.2 (D.C. Cir. 1989) ("The dissent suggests that our analysis of standing must proceed from constitutional to prudential requirements. Although that is the oft-stated sequence, the rule of avoidance counsels nonetheless that, where the prudential question is clearly dispositive, we should not reach out to determine the constitutional issue." (citing *Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1194 (D.C. Cir. 1987); *Calumet Indust., Inc. v. Brock*, 807 F.2d 225, 228 (D.C. Cir. 1986); *Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C. Cir. 1977)); *see also Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 97 n.2 (1998) (accepting the proposition that "a statutory standing question can be given priority over an Article III question"). This more flexible approach is especially important in cases like this one, where "constitutional and antitrust standing overlap"—cases "where the plaintiff has not shown any injury caused by the antitrust violation." IIA Philip E. Areeda, et al., Antitrust Law ¶ 335a, p. 77 n.7 (4th ed. 2014).

ii.

As relevant here, antitrust standing requires a plaintiff to show an actual or threatened injury "of the type the antitrust laws were intended to prevent" that was caused by the defendant's alleged wrongdoing. *Andrx Pharm., Inc.*, 256 F.3d at 812; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–13 (1986) (discussing antitrust standing and the necessity of "antitrust injury" in suits under the Clayton Act).

To understand the scope of antitrust standing, we focus on the bedrock principle of this field: antitrust laws protect market (*i.e.* economic) competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Plaintiffs, however, define their injuries as millions of dollars in free media, campaign donations, and federal matching funds—injuries to them as *individual candidates* in a *political contest* for votes. Square peg, meet round hole.

As an initial matter, this Court has clearly held injury to a single competitor does not suffice to constitute an injury to competition. *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 486–87 (D.C. Cir. 1996). Further, and most important, "neither the business of conducting the government nor the holding of a political office constitutes 'trade or commerce' within the meaning of the Sherman Act." *Sheppard v. Lee*, 929 F.2d 496, 498 (9th Cir. 1991). This conclusion—that an antitrust

violation must involve injury to commercial competition—is supported by Plaintiffs' inability to define a commercial market in which they operate. Instead, they discuss the "presidential campaign market," "the electoral politics market," and the "presidential candidates market," Compl. ¶¶ 1, 11, JA 15, 18, and identify their product as "information about themselves or other presidential candidates," Blue Br. 23. While these terms may capture what political scientists call a "political economy," the phrase is merely a term of art. Short of alleging Americans are engaged in a widespread practice of selling their votes—which the Complaint does not do—the "market" Plaintiffs identify is no more regulated by the antitrust laws than the "marketplace of ideas" or a "meet market."

The injuries Plaintiffs claim are simply not those contemplated by the antitrust laws. Consequently, Plaintiffs' antitrust claims fail to meet the requirements of antitrust standing.

III.

Finally, we turn to Plaintiffs' First Amendment claim. Perhaps in an effort to tack around unfavorable case law, the Complaint states the Commission's debates "exert a *de facto* influence on the outcome of presidential elections" such that exclusion from the debate, "in light of proven political realities, guaranteed [Plaintiffs] to lose." Compl. ¶¶ 110–11, JA 54. Plaintiffs therefore allege the fifteen percent polling criterion, "selected by Defendants with the specific intent of suppressing the viewpoints of third party or independent presidential candidates and to boost the political speech of the two major party nominees," constitutes an "unreasonable burden on free speech or political association in violation of the First Amendment." Compl. ¶¶ 119–20, JA 56; *see also id.* ¶ 130, JA 57 (alleging the fifteen percent requirement "imposes a burden

on voting and associational rights in violation of the First Amendment"); *see generally Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998).

None of these allegations articulate a clear legal claim, let alone identify a cognizable injury. To make matters worse, the Complaint omits entirely any allegation of government action, focusing entirely on the actions of the nonprofit Defendants. *See, e.g.*, *Rendell-Baker v. Kohn*, 457 U.S. 830, 837–43 (1982) (discussing the state action requirement).

In *Steel Co. v. Citizens for a Better Environment*, the Supreme Court observed that, in some "extraordinary" cases, federal courts may pretermit the jurisdictional threshold and dismiss a claim that is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." 523 U.S. at 89. The First Amendment claim here fits the bill. Under these circumstances, it would be improper—and indeed impossible—for the Court to conduct a meaningful standing analysis. There may be First Amendment injuries we could invent for Plaintiffs, but those claims were not presented in the Complaint. *See Warth v. Seldin*, 422 U.S. 490, 509–10 (1975) (examining the face of the complaint to determine whether a plaintiff has established Article III standing).

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

PILLARD, *Circuit Judge*, concurring in Part I and concurring in the judgment:

I join Part I of the majority opinion. I write separately as to Parts II and III because, although I entirely agree that both the antitrust and First Amendment claims fail, we are a court of limited jurisdiction obligated to decide the Article III standing question before assessing the merits of the claims. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340-42 (2006); *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc*., 528 U.S. 167, 180 (2000). Despite its misleading name, "statutory standing" is not jurisdictional in the Article III sense, as the Supreme Court made clear in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.4 (2014). *See also Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 & nn.17-18, 545-46 (1983) (dismissing case for lack of antitrust injury only after assuming the complaint stated a valid antitrust claim). We thus cannot sidestep the Article III standing inquiry and dismiss instead on statutory "antitrust standing" grounds. "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e*., the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Because I would dismiss both claims under Rule 12(b)(6) only after determining Article III standing, I concur in the judgment.

The majority's exertions to avoid addressing Article III standing in the ordinary course are puzzling, given that plaintiffs' standing appears to be straightforward under the classic injury-causation-redressability formulation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The majority does not dispute that the plaintiffs ("Johnson and Stein") identify concrete and particularized injury from having been excluded from the 2012 presidential and vice-presidential debates. Maj. Op. at 6 (acknowledging that Johnson and

Stein's "injuries are clearly pleaded in the Complaint" and are "particularized"). The court stops short of holding that Johnson and Stein's injury is fairly traceable to the defendants' actions, however, *see id.* at 8 (suggesting they have "not shown any injury caused by the antitrust violation"), and also denies that, in the (admittedly unlikely) event that they were to succeed on the merits of their claims, plaintiffs' injuries would be redressable.

Plaintiffs' allegations satisfy the latter two standing inquiries as readily as they do the first. Johnson and Stein allege that the challenged 15 per cent polled-support requirement was the direct cause of their injury. Had the MOU not imposed that 15 per cent threshold, they would have qualified to participate. *See* Compl. ¶ 83, J.A. 48. Those allegations suffice at the pleading stage to state causation. *See Attias v. CareFirst, Inc.*, No. 16-7108, slip op. at 15 (D.C. Cir. Aug. 1, 2017) ("Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant."). And the redressability of Johnson and Stein's alleged injury flows from their theory of causation. If they were to prevail, the court could award compensation for the injuries their exclusion caused. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 286-87 (2008); *see also Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984) ("A damage claim, by definition, presents a means to redress an injury."); *Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007) ("[A]t the pleading stage, a party must make factual allegations showing that the relief it seeks will be likely to redress its injury.").

It is that last element of standing—redressability—that the majority cannot swallow, as it anticipates that any court-

ordered relief would violate the Commission's First Amendment rights. Maj. Op. at 7. I assume the court is correct on that point. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573-74 (1995); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). I disagree only with treating the merits of a First Amendment defense not yet in issue as an obstacle to standing. The majority cites a passing suggestion in *Perot v. FEC* that, if the court were to enjoin presidential debates or the Commission on Presidential Debates' (CPD's) choice of participants, "there would be a substantial argument that the court would itself violate the CPD's First Amendment rights." 97 F.3d 553, 559 (D.C. Cir. 1996). Again, I assume as much. But we did not identify the First Amendment as an obstacle to standing in *Perot*—nor, for example, did the Supreme Court in *Hurley* or *Tornillo*.

A standing inquiry, especially at the motion-to-dismiss stage, should not anticipate the merits—neither of the claim nor, especially, of a potential defense. A conclusion that appellants' claims cannot be redressed because of a potential First Amendment obstacle would be impermissibly "deciding the merits under the guise of determining the plaintiff[s'] standing." *Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003); *see Warth v. Seldin*, 422 U.S. 490, 500 (1975) (observing that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) ("In reviewing the standing question, we must be 'careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'"). Redressability, like any other aspect of jurisdiction, "is not defeated . . . by the possibility that the averments might fail to state a cause of

action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). The majority explains its order of operations by invoking pre-*Lexmark* cases for dismissal on statutory standing grounds "in rare cases where [the] jurisdictional, Article III standing inquiry yields grave constitutional doubt." Maj. Op. at 8. But, as noted above, the First Amendment concern is not even part of the Article III standing inquiry; Johnson and Stein's standing itself raises no grave or doubtful constitutional question. I would therefore hold that Plaintiffs have Article III standing to bring their antitrust claims before I would dismiss them on their merits.

The majority dismisses the complaint on antitrust standing grounds because plaintiffs do not allege injury to competition, but rather identify harms to themselves that are "simply not those contemplated by the antitrust laws." Maj. Op. at 10. I agree that the antitrust claim fatally fails to tie the major party candidates' alleged collusion to any anticompetitive harm to an identified commercial market or market participant. The complaint does not articulate a theory under which trade or commerce has been restrained by the MOU. It therefore falls outside the ambit of antitrust regulation, the aim of which is to promote economic competition. *See* I PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 100a at 3-4 (4th ed. 2014); *cf. United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise."); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) (describing Sherman Act as "comprehensive charter of economic liberty").

The complaint refers to various "markets," but the defining competitive dynamic of the activities it so labels is political. It alleges, for instance, collusion in the "presidential debates market," the "presidential campaign market," the "electoral politics market," and the "presidential candidates market."

5

Compl. ¶¶ 1, 11, J.A. 15, 18.  That flaw is not repaired by the complaint's allegations of various ways in which U.S. presidential campaigns involve a lot of money.  The televised debates are expensive to stage, generate revenues for venues and their host localities, and can boost the fundraising of successful participants.  *See id*. ¶¶ 35-41, J.A. 29-33.  But "the antitrust laws should not regulate political activities 'simply because those activities have a commercial impact.'"  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 (1988) (quoting *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141 (1961)).  Nor is antitrust scrutiny triggered every time someone in an activity that involves or affects commerce contends that others have agreed to act in a way that fails equally to enhance the claimant's access to money.  Not every joint business venture is an antitrust violation.  *See Associated Press v. United States*, 326 U.S. 1, 23 (1945) (Douglas, J., concurring).  To be actionable, an agreement must unduly restrain or monopolize trade or commerce.  *See Standard Oil Co. v. United States*, 221 U.S. 1, 59-62 (1911).

The majority and I agree that the complaint fails for want of any connection between the major party candidates' alleged collusion in planning and restricting their joint debates and anticompetitive harm to an identified commercial market.  But I disagree that the deficiency is only one of antitrust standing.  Because the claim would equally be deficient if the plaintiff were the government, which need not prove statutory standing, I would affirm the dismissal as a failure to state a cognizable violation rather than as a statutory standing shortfall.  *See* AREEDA, ANTITRUST LAW ¶ 335f at 91.

Part III of the opinion, dismissing Johnson and Stein's First Amendment challenge to their exclusion, also puts the merits cart before the Article III standing horse.  I would

dismiss this claim, too, for failure to state a claim rather than for want of standing. The constitutional allegations plainly fail the established "state action" requirement. "It is fundamental that the First Amendment prohibits *governmental* infringement on the right of free speech." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982) (emphasis added). Moreover, a candidate debate is a forum that, even if run by a public entity, could still be nonpublic and impose reasonable, viewpoint-neutral access restrictions without running afoul of the First Amendment. *See Arkansas Educ. Tel. Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998).

Both of plaintiffs' claims lack merit. Before so deciding, however, we must determine whether plaintiffs have standing. To do so, we must take the allegations of the complaint as true and assume the validity of the plaintiffs' legal theory. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (citing *Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012)). Under those requisite assumptions (however ultimately unavailing the claims might be), plaintiffs here have standing to sue. I join Part I but, because this case presents no reason to "pretermit the jurisdictional threshold," Maj. Op. at 11, I concur only in the judgment.